FOURNET, Justice.
 

 Wilfred J. Begnaud, in liis capacity as State Bank Commissioner (now Director of Banking for the State of Louisiana), joined by J. Edward McGuire, the liquidator in charge of the Hibernia Bank & Trust Company, in Liquidation, holder of a $45,000 note executed by the Guaranty Development Company, Inc. (hereafter referred to as Guaranty), in 1932, instituted this suit on December 22, 1941, against R. N. Sims, H. J. Bremermann, and Marion J. Green, former liquidators of Guaranty, and the Secretary of State, to have the certificate issued by the Secretary of State dissolving Guaranty annulled, Guaranty revived as a corporation, and its liquidators reinstated in office on the ground that “there are in existence assets of said corporation which should be administered for the benefit of its creditors.” They also seek to have a judgment rendered in favor of the plaintiff bank and against the “Guaranty Development Co., Inc., in Liquidation,” for the balance due on the note, which, at the time this suit was instituted, with interest and subject to credits, amounted to $55,040.
 

 Answering this petition the three liquidators averred that Guaranty had been regularly dissolved after a resolution to that effect had been adopted by its stockholders and due notice thereof filed with the Secretary of State, in accordance with the provisions of Section 54 of Act No. 250 of 1928; that its affairs had been liquidated and every known asset turned into cash, the balance remaining after payment of all costs and expenses being turned over to the Secretary of State on account of unpaid franchise taxes owed by Guaranty ; and that, in accordance with the provisions of Section 62 of Act No. 250 of 1928, a certificate of dissolution had been filed with the Secretary of State and a final certificate of dissolution accordingly issued by him on May 14, 1937. They further averred that they had no knowledge of any assets of Guaranty still remaining that might be converted into cash for the benefit of its creditors and stockholders, but that “if, by inadvertence or because of the existence of facts of which they had or have no knowledge, anything further remains to be done to complete the performance of their duty as such liquidators, they are ready, able and willing to do so.”
 

 The Secretary of State, represented by a special assistant to the Attorney General, denied that plaintiffs were entitled to have Guaranty re-constituted and pleaded that there be judgment dismissing their suit; in the alternative that if there should be judgment annulling the official certificate of dissolution and reinstating the liquidators, the state’s right to' collect the franchise taxes due by Guaranty for the years 1934, 1935, 1936, and 1937 be preserved.
 

 On the issues as thus made up the case was tried on its merits. At the termination of the trial, exceptions of no cause and no right of action and of prescription and estoppel were filed by the defendants. Nevertheless the trial judge, although ex
 
 *1093
 
 pressing the opinion that he doubted the petition disclosed a right or cause of action, decided the case on its merits, and, after taking into consideration all of the evidence introduced, dismissed plaintiff’s suit, being of the opinion that the plaintiffs had failed to show Guaranty had any assets that could be recovered even if the liquidators were reinstated. The plaintiffs are appealing.
 

 We gather from their argument that counsel for the plaintiffs do not dispute the fact findings of the trial judge, but, rather, contend that Guaranty’s affairs must have been mismanaged or else that there must have been a breach of trust on the part of someone, although no fraud or error is even intimated, since from the investigations conducted by H. W. Bel for (employed by T. Semmes Walmsley when he [Walmsley] was engaged in investigating the affairs of the Hibernia Bank & Trust Company, In Liquidation, in 1941), on whose testimony the plaintiffs base their case, it appears that when Guaranty was liquidated in 1936 no one received anything except the State of Louisiana, to whom a small amount was paid because of its claim for corporate and franchise taxes, although four years previous, when Guaranty’s note for $45,000 was executed, in 1932, the assets of the corporation had a book value of over $5,000,000; consequently, that someone should be sued by somebody to recover something for the creditors and stockholders of Guaranty. As stated in their brief, it is their contention “that a prima facie case has been made out which would justify these liquidators representing the stockholders and creditors examining into the question of whether or not there has been a breach of fiduciary duty on the part of the directors of the Guaranty Development Company in these transactions * * * ” and that “ •* * * the Certificate of Dissolution of the corporation should be annulled and the liquidators should be ordered to make an inquiry and
 
 attempt to
 
 ascertain whether there are any claims which could be asserted against the officers or directors of the defunct corporation or any assets left which can be administered, or any profits made by the majority stockholders or directors out' of the property of the company which profits would be held under the law, in trust for the creditors of the company.” (Italics ours.)
 

 The history of Guaranty’s incorporation and dissolution, as shown by the record, is, briefly:
 

 Guaranty came into being when the name of the Hotel Grünewald Company, Ltd., the original owner of the then Grünewald and Bienville hotels in the City of New Orleans, was changed to The Hotel Grünewald Caterers, Inc., in 1920 and to the Guaranty Development Company, Inc., in 1923. The Grünewald, at that time, became the Roosevelt Hotel. Guaranty retained the ownership of these hotels from that time until, in December of 1929, it gave a first mortgage on the Roosevelt to secure a note in the sum of $2,750,000 given the Metropolitan Life Insurance Company and a first mortgage on the Bienville in the sum of $200,000 to secure a note given Metropolitan for that amount. On December 2, 1929, the New; Orleans Roose
 
 *1095
 
 velt Corporation (referred to hereafter as Roosevelt), with a cash capital of $10,000, was formed, Guaranty acquiring 2,500 of its 10,000 shares for $2,500 and the United Hotels of South and West, Inc., the remainder for $7,500. (Roosevelt later exchanged 50 of its shares of Merchandise Brokerage Company stock for these 7,500 shares and thus reacquired them from the United Hotels corporation.) Guaranty, retaining the Bienville Hotel in its own name, conveyed the Roosevelt Hotel to the corporation thus formed on December 31, 1929, for the recited consideration of $6,-000,000, $2,750,000 of which consisted of the mortgage‘held by Metropolitan, the remainder, or $3,250,000 of “ready and current money.” Actually, this “ready and current money” was bonds totalling that amount, $250,000 of them (payable on January 1, 1933, 1934, and 1935) secured by a second mortgage on the Roosevelt Hotel, and $3,000,000 of them (payable on January 1, 1950) secured by a third mortgage on the Roosevelt Hotel.
 

 Guaranty transferred $75,000 of . these $3,000,000 third mortgage bonds to the Hibernia Bank & Trust Company for “financial services,” retaining the remainder in its treasury. It converted the $250,000 second mortgage bonds into cash by selling them to P. H. Saunders, Inc., and Samuel Zemurray, with the understanding that $50,000 of them would be taken off their hands by S. D’Antoni in the event the Roosevelt corporation failed to pay them when they matured on January 1, 1933. (D’Antoni’s obvious purpose in agreeing to take these bonds was to assist Guaranty in realizing some ready cash on the second mortgage bonds and he subsequently acquired them in this manner.)
 

 In July of 1931, Roosevelt’s charter having been amended to permit an increase in its capital stock to 52,500 shares (2,500 of these preferred and the remainder common), it exchanged 10,000 shares of common stock for the 10,000 shares of its original capital stock and 2,500 common shares for the 2,500 shares Guaranty had originally acquired when Roosevelt was formed. Only 1,800 shares of the preferred stock were ever issued. Roosevelt, being unable to meet the interest payments when they became due on the $3,000,000 third mortgage bonds ($75,000 held by Hibernia and $2,925,000 by Guaranty), gave, in lieu thereof, 46 shares of its preferred and 667 shares of its common stock to the Hibernia and 1,754 shares of its preferred and 39,333 shares of its common stock to Guaranty. This meant that of the 50,000 shares of common stock issued by Roosevelt under its amended charter, the corporation retained the 7,500 reacquired from the United Hotels corporation, Guaranty held 41,833, and the Hibernia 667, while, of the 1,800 preferred shares of Roosevelt stock, Guaranty held 1,754 shares and Hibernia 46.
 

 But following in the wake of the unprecedented era of expansion and inflation during which the Roosevelt Hotel had been sold to Roosevelt, came the period of our greatest economic depression, with a resultant loss to the Roosevelt Hotel in the years between 1930 and 1934 of over $1,-000,000 and to the Bienville of nearly $400,-000. Guaranty and Roosevelt, therefore,
 
 *1097
 
 of necessity, defaulted on the first mortgage notes held by Metropolitan and owed that company (with principal, interest, and the taxes paid by the mortgagee) $3,163,-190.07 on the Roosevelt Hotel note and $249,967.93 on the Bienville. In addition thereto, the obligation on the second mortgage bonds (held by Saunders, Zemurray, and D’Antoni), on which Guaranty and Roosevelt also defaulted, amounted to $299,201.37, with the interest included. Consequently, toward the middle of 1934, Guaranty, with only $392.52 in cash; valueless third mortgage notes of Roosevelt; and practically all of its valuable shares of stock pledged to secure the $30,-000 loan of the American Bank & Trust Company in 1930, the $45,000 loan, on which this suit is predicated, made by Hibernia on December 27, 1932, and the $75,000 loan made by the Banco Altantida of Honduras on August 31, 1932, found itself not only without credit and indebted to a great many unsecured creditors (its books at this stage showed a deficit of almost $3,000,000) but also without funds with which to carry on the operation of the Bienville. In addition, it was threatened with Metropolitan’s foreclosure on the first mortgages on the Roosevelt and Bienville, for both of which loans Guaranty was, of course, primarily liable.
 

 In this dilemma, and with a great deal of difficulty, Guaranty, with the cooperation of its mortgage creditors (Metropolitan, Saunders and associates, and D’Antoni), effected a reorganization of the two hotel properties. Under this plan Guaranty was released from any personal liability on the bonded indebtedness to Metropolitan ; was given the ten shares of nominal capital of the Lee Circle Hotel Co., Inc., a new corporation formed to take over the Bienville and assume the mortgage on it held by Metropolitan; and secured an extension of the obligation on the first and second mortgage bonds on both the Bienville and Roosevelt hotels. (Roosevelt transferred to Guaranty, in exchange for the 10 shares in Lee Circle, the 7,500 shares reacquired from United Hotels and held in its treasury, thus increasing to 49,333 the number of Roosevelt’s common shares held by Guaranty.) In return, Guaranty transferred, out of its 49,333 shares of Roosevelt common stock, 25,200 shares to Seymour Weiss as consideration for the $100,-000 he put into Roosevelt’s treasury to meet the pressing and immediate operating needs of the Roosevelt Hotel, and 500 to Hibernia as consideration for its approval of the reorganization plan, thus leaving Guaranty with 23,633 shares. Guaranty and Hibernia returned all of Roosevelt’s preferred stock shares then held by them (totalling 1,800) and cancelled all of their $3,000,000 third mortgage bonds. This plan of reorganization, entered into on January 3, 1934, was not only approved by all of the mortgage creditors and directors of Guaranty by a unanimous vote, but was also joined in and approved by order of the Civil District Court for the Parish of Orleans upon the recommendation of the then State Bank Commissioner and the liquidator of Hibernia (the two plaintiffs in this suit) in consideration for Guaranty’s transfer to Hibernia of the 500 additional shares of Roosevelt’s common stock just referred to.
 

 
 *1099
 
 Guaranty’s salvage and revitalization was thus apparently assured. But, with very little economic improvement, by February of 1936, Guaranty’s deficit had, passed the $4,000,000 mark. And this time Guaranty had nothing of value to barter in exchange for another chance of survival under a second reorganization or some other such scheme. Guaranty’s 23,633 shares of Roosevelt’s common stock and 500 preferred shares of Laundry and Dry Cleaning Service, Inc., had been pledged with the American Bank and Trust Company, upon its demand, as additional collateral to secure Guaranty’s indebtedness. Guaranty’s 1,000 preferred and 120,000 common shares of Laundry and Dry Cleaning Service, Inc., stock had been pledged with the Banco Atlantida in compliance with that bank’s demand for additional collateral to secure its loan. The State of Louisiana had secured a judgment against Guaranty for unpaid franchise taxes amounting to some $28,000, and, in satisfaction thereof, had foreclosed and caused to be sold at public auction by the Civil Sheriff, after due advertisement, real estate belonging to Guaranty adjacent to the Bienville and Guaranty’s $40,000 Roosevelt note. In addition, Guaranty owed various other unsecured debts, among them one for $40,000 to the Tropical Ice Company and another to Chalmette Petroleum Corporation for almost $10,000. To meet this onslaught of obligations, Guaranty had exactly $698.26 in cash. With its affairs in this condition, the stockholders, at their meeting on March 16, 1936, had no other recourse than to vote for Guaranty’s dissolution and liquidation. The American and Banco Atlantida immediately foreclosed on the notes of Guaranty held by them, the bonds securing American’s note being purchased at public auction in May of 1936, after due advertisement, by Dr. Saunders, Ralph Lally, and others associated with them; those securing Banco Atlantida’s note being likewise purchased at public auction in May for the bank’s account by its attorney. Guaranty’s liquidation proceeded in a regular and orderly manner, all legal requirements being met, and, as found by the trial judge, the “liquidators gave loyal allegiance and faithful service to their trust.”
 

 But counsel for plaintiffs, without alleging fraud or error, point a finger of suspicion at three transactions which they contend are examples of the manner in which Guaranty’s affairs were mismanaged, with the result that its assets were dissipated and eventually benefited those in control of that corporation. These are the transactions whereby Guaranty’s asset of 23,633 shares of Roosevelt’s common stock and of 500 shares of Laundry & Dry Cleaning Service preferred stock was pledged as additional collateral to secure the American Bank & Trust Company’s loan; its assets of preferred and common stock of the Chalmette Petroleum Corporation and the Laundry & Dry Cleaning Service were pledged as additional collateral to secure the Banco Atlantida loan; and its asset of the $40,000 Roosevelt note was sold for $1,000. We have very carefully investigated all of these transactions and find nothing suspicious about them.
 

 The American Bank loaned Guaranty $30,000 in 1930 without security. When
 
 *1101
 
 the bank demanded that this loan be' secured in August of 1931, Guaranty pledged with the bank 250 -preferred shares of Laundry & Dry Cleaning Service, Inc., stock, but later requested that these shares be returned and substituted therefor 1500 shares of $7 preferred stock of the Standard Fruit and Steamship Company. In December this collateral was increased by the pledge of 500 shares of the laundry’s preferred stock and this status was maintained until October of 1933. At that time the 1,500 shares of Standard stock were returned to Guaranty, 1,570 shares of $3 participating preference stock of the Standard Fruit and Steamship Company being deposited in lieu thereof. In November of 1935 Guaranty withdrew these 1,570 shares on a trust receipt, returning 1,284 of the shares almost immediately. This meant that Guaranty owed the bank on this receipt a balance of 286 shares. When American demanded that Guaranty make these shares good, Guaranty delivered to the bank as additional collateral the 23,633 shares of Roosevelt common stock owned by it. Since Guaranty never returned the 286 shares of Standard stock, the bank retained the Roosevelt common shares. Mr. C. S. Bauman, then vice-president of American, explaining this transaction, stated the bank did not consider the 23,633 shares of Roosevelt common stock as valuable as the 286 shares of Standard stock withdrawn by Guaranty because the Standard stock, being listed, could easily have been sold on the open market, then very unsatisfactory, while the Roosevelt, not being listed, could not. As a matter of fact, Guaranty never owned either the 1,500 shares of $7 preferred stock of Standard or the 1,570 shares of Standard’s $3 participating preference stock, the former having been the property of Vaccaro Brothers & Company at the time it was loaned to Guaranty to secure- the American loan, the latter having at all times been the property of Felix Vaccaro. (When Vaccaro Brothers was thrown into liquidation-in 1933, its 1,500 shares of Standard stock had been recalled for distribution among its members and Felix Vaccaro, in an effort to assist Guaranty in maintaining its loan with the bank, had pledged his personal stock to secure the loan.) Consequently, when the bank foreclosed on the Guaranty note in 1936, Mr. Vaccaro’s attorney, Monte Lemann, demanded that the bank first sell the 23,633 shares of Roosevelt common stock and the 500 preferred shares of laundry stock in satisfaction of the debt before disposing of Vaccaro’s personal stock. Accordingly, this stock was put up for sale at public auction, all legal formalities being complied with, and was bought by Mr. Lemann for a sum sufficient to cover Guaranty’s indebtedness to American. Upon demand, the bank then returned Mr. Vaccaro’s stock.
 

 The Banco Atlantida, on August 31, 1932, loaned Guaranty $75,000, secured by 12,-730 shares of common and 1,496% shares of preferred stock of the Chalmette Petroleum Corporation. No dividend having been paid on this stock for many years, Banco, by letter dated March 9, 1933, demanded additional collateral as security., In compliance with this demand, Guaranty deposited with Banco 1,000 shares of preferred and 120,000 shares of common stock
 
 *1103
 
 of the Laundry & Dry Cleaning Service, Inc. Being in possession of this collateral when it foreclosed on Guaranty’s note in May of 1936, Banco, through its attorney, Monte Lemann, bid in the stock at public auction for the full amount of the note. But the bank realized very little on this security. The stock of the laundry company proved to be worthless when it was wiped out by a foreclosure on the company’s bonds and, although Banco apparently still owns the Chalmette Petroleum Company stock in its own name, with the exception of a dividend paid the preferred stockholders in 1941, nothing had ever been realized on this stock at the time this suit was instituted.
 

 The original face value of the Roosevelt note was $70,000. It had been reduced to $32,000 by the time of Guaranty’s liquidation, and, with the interest due, amounted to about $36,000. Numerous efforts had been made to collect this amount from Roosevelt, but the Metropolitan, holder of the first mortgages on the Roosevelt and Bienville hotels, refused to permit any further payments on the note. When Guaranty’s liquidators endeavored to turn the Roosevelt note and unencumbered real estate owned by it adjacent to the Bienville Hotel into cash, they were advised by the then Attorney General that
 
 both
 
 of these assets were going to be seized and sold in satisfaction of a judgment obtained by the state against Guaranty, amounting to about $28,000, for unpaid franchise taxes. Accordingly, all formalities required by law having been complied with, the property was sold at public auction to the highest bidder for some $9,000 and the note for $1,000. Thus, the note was not only sold legally for this amount, but the plaintiffs do not even intimate there was any fraud, error, or collusion in the sale, much less allege it. As a matter of fact, the small amount bid for this note is, in our opinion, most convincing proof that no one thought it was worth much more than the paper it was written on.
 

 In view of all of these circumstances, while we think the Director of Banking, on the face of the report made to him by Belfor, was probably justified in joining in the institution of this suit, we cannot conceive of any legitimate claim Guaranty may have against any of its directors or officers or of any other asset the plaintiffs, with the resources and facilities at their command, cannot uncover without the aid of Guaranty’s liquidators that they can uncover with their aid.
 

 For the reasons assigned, the judgment appealed from is affirmed, at the cost of appellants.